IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
Case No: 7:16-cv-86

| | |
|---|---|
| WFC Management Corp., d/b/a ISO Aero Service; and Gerard and Ann Tremblay; | ) ) ) |
| Plaintiffs, | ) |
| v. | ) ) |
| NEW HANOVER COUNTY AIRPORT AUTHORITY in their official capacity; JULIE WILSEY, individually and in her official capacity as Airport Director; and GARY W. BROUGHTON, individually and in his official capacity as Airport Deputy Director, | ) ) ) ) ) ) ) |
| Defendants | ) |

**COMPLAINT**
**(Jury Trial Demanded)**

NOW COMES THE PLAINTIFFS, by and through counsel, complaining of the defendants, and

alleges and says:

# TABLE OF CONTENTS

**NATURE OF THE ACTION**…………..……………………………………………………..3

**JURISDICTION AND VENUE** ............................................................................................... 4

**PARTIES** ................................................................................................................................ 4

**FACTS COMMON TO ALL CLAIMS** ................................................................................ 5

    A.    The Fuel Truck policies that unjustly discriminated against Aero Service ...................... 9

    B.    Airport Actions and Policy making it economically impossible to operate
        a second FBO at ILM ................................................................................................. 13

    C.    Alleged fuel contamination in the South Ramp area .................................................. ...29

**FIRST CLAIM FOR RELIEF: DISPARATE TREATEMENT
PURSUANT TO 42 U.S.C. § 1983** ........................................................................... ...30

**PRAYER FOR RELIEF** ......................................................................................... 40

## NATURE OF THE ACTION

1.      This is a civil action for damages and injunctive relief under the First and Fourteenth

Amendment to the United States Constitution; Article I, § 9 of the North Carolina State

Constitution; as well as 42 U.S.C. § 1983. The purpose of this action is to hold Defendants liable

for depriving Plaintiffs of their property and liberty rights without due process of law, in

violation of their equal protection rights under state law and in violation of the First and

Fourteenth Amendments to the United States Constitution and Article I, § 19 of the North

Carolina Constitution.

2.      Plaintiff WFC Management, doing business as ISO Aero Service ("Aero Service" or

"Plaintiff"), managed I.S.O. Aero Service, Inc., which was the Fixed-Based Operator ("FBO")

chosen to replace Jetstream Aero Service, Inc. ("Jetstream") at the Wilmington International

Airport ("ILM") when Jetstream left the airport due to a policy of discriminatory practices by the

Airport employees and the New Hanover County Airport Authority ("Airport Authority" or

"Defendant"). I.S.O. Aero Service, Inc. and ISO Aero Service/WFC have suffered the same fate

as Jetstream, and have been driven from the airport by the unjustly discriminatory policies and

intentionally unjust activities of the Airport Director, Airport Manager, and the Airport

Authority—those same practices at issue in *Jetstream Aero Service, Inc. v. New Hanover County*

*et al*., 672 F. Supp. 879 (E.D.N.C. 1987).

3.      The ILM staff and New Hanover County Airport Authority have violated lease terms by

directing the public safety office to make sure I.S.O. Aero Service's employees could not get

approved to drive on the airport, and by promulgating policy and procedure to intentionally

injure I.S.O. Aero Service, all to ensure that no FBO can succeed against ILM FBO owner

William Cherry ("Bill Cherry").

4.     Bill Cherry has owned and operated the primary FBO at ILM since 1975, operating under the names: Air Wilmington, Inc. ("Air Wilmington"), Wilmington General Aviation Industries, Inc. ("Wilmington General"), and Aeronautics, Inc. ("Aeronautics"). These businesses are separate businesses on paper, and have, at times, had separate leaseholds at ILM, but they are for all practical purposes one business, Air Wilmington.

5.     The promulgation of policies that only impact the FBOs competing with Bill Cherry, and the arbitrary and capricious enforcement of fairly-written policies, shows an intentional or purposeful discrimination in violation of the equal protection afforded I.S.O. Aero Service.

## JURISDICTION AND VENUE

6.     This court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as the claims of the plaintiffs arise under the laws of the United States.

7.     Venue of this action is proper pursuant to 28 U.S.C. § 1391(a) and (b), as the action is brought in the district in which the named defendants may be found and in the district in which a substantial part of all events complained of occurred.

## PARTIES

8.     I.S.O. Aero Service, Inc. ("I.S.O. Aero Service") was a successful Fixed-Base Operator ("FBO") located in Kinston, North Carolina who was recruited to replace Jetstream as one of the FBOs located at Wilmington International Airport ("ILM"). The FBO began as I.S.O. Aero Service, Inc. which did business as ILM Aero, then in 2002 began doing business as Aero Service. I.S.O. Aero Service was an FBO at ILM from 1990 through 2014, when I.S.O. Aero Service' lease was terminated by the New Hanover County Airport Authority ("Airport Authority" or "Defendant").

4

9.    I.S.O. Aero Service was owned and operated by Ken Vojta from 1990 through 2013, when the assets of the business were purchased by Gerard Tremblay ("Mr. Tremblay" or "Plaintiff") through Plaintiff WFC Management Corporation ("WFC"), leaving Ken Vojta as leaseholder only.

10.   Plaintiff WFC filed in New Hanover County to do business as ISO Aero Service. Plaintiff WFC was doing business as ISO Aero Service ("ISO Aero Service/WFC") up until ILM removed ISO Aero Service, managed by WFC, as FBO in 2014.

11.   Defendant Airport Authority is the sponsor of ILM, whose Board Members are appointed by the New Hanover County Commissioners. Currently the Board Members are: John O. Perritt ("Perritt"), Chairman Jonathan S. Crane ("Crane"), Thomas Barber ("Barber"), Donna Giradot ("Giradot"), Dan Hickman ("Hickman"), Secretary Carter Lambeth ("Lambeth"), and Vice-Chairman Thomas Wolfe ("Wolfe").

12.   Gary Broughton ("Broughton") is the Deputy Airport Director for ILM. Prior to this position Broughton served as the Director of Operations for ILM.

13.   Defendant Julie A. Wilsey ("Wilsey") is currently the Airport Director for ILM. She has held several positions at ILM, including Assistant Airport Director and Facilities Director.

## FACTS COMMON TO ALL CLAIMS

14.   I.S.O. Aero Service was a very successful FBO operating out of the Kinston, NC airport through November of 1990, when the company was recruited by the Airport Authority to relocate to ILM.

15.   The recruitment of I.S.O. Aero Service was to replace a previous FBO tenant, Jetstream, after protracted dispute involving claims Jetstream made of discrimination by the Airport Authority in violation of the Sponsor Grant Assurances. In the Jetstream dispute, the FAA found

the Airport Authority had engaged in discriminatory activities against Jetstream and allowed 15 days for the Airport Authority to come into compliance. Jetstream was also in litigation involving ILM and Air Wilmington.

16.     The Airport Authority is a seven-person Board, appointed by the New Hanover County Commissioners. Each term of office is four years, and Board Members may serve two four-year terms consecutively, but then must wait two years to be re-appointed. Currently the Board Members are John O. Perritt ("Perritt"), appointed June 17, 2013 (Chairman July 2014 through July 2015); Chairman Jonathan S. Crane ("Crane"), appointed June 17, 2013 (Chairman July 2015 to present); Member Thomas Barber ("Barber"), appointed June 20, 2011 (Chairman July 2013 through July 2014); Member Donna Giradot ("Giradot"), appointed September 15, 2014; Member Dan Hickman ("Hickman"), appointed September 15, 2014; Secretary Carter Lambeth, ("Lambeth") appointed June 18, 2012; Vice-Chairman Thomas Wolfe ("Wolfe"), appointed September 15, 2014.

17.     ILM also has an Airport Director, currently Julie A. Wilsey ("Wilsey"), but this position has been filled by several people since 1990. During the times relevant to this case, the airport directors were William Plentl ("Plentl"); Jonathan Rosborough ("Rosborough"), who was director for 14 years and retired in December 2014; and the current director, Wilsey. Wilsey has been employed at ILM since 1999, in the positions of Deputy Airport Director (2001 – 2014) and Facility Director (1999-2001).

18.     Another ILM employee or agent involved in the matters is Gary W. Broughton ("Broughton"), who has recently been appointed Deputy Airport Director, and who served as the Director of Operations in the past.

19.     The Wilmington International Airport is located at the mid-point between New York and Florida, and the ILM catchment area includes eight North Carolina counties, with a population of approximately 839,733 residents. ILM is a small-hub, commercial service airport, approximately 150 miles from a medium-hub airport in Raleigh/Durham and 200 miles from a large-hub airport in Charlotte. ILM offers General Aviation Services, including aircraft maintenance and cleaning, charter service, fueling, flying lessons, hangar storage and tie-down services.

20.     William "Bill" Cherry ("Cherry") is the owner and operator of several FBOs at ILM: Air Wilmington, Wilmington General, and Aeronautics. Aeronautics was dissolved in 1985 through the N.C. Secretary of State's office, though as late as 2006 people were still referring to a portion of the ILM FBO activities as under Aeronautics.

21.     Cherry is the same FBO owner involved in the Jetstream FAA Complaint and litigation; there, it was alleged the Airport Authority and the Airport Director (for the time relevant to Jetstream) were acting in ways to discriminate against Jetstream and promote Air Wilmington. *See Jetstream*, 884 F.2d 1388.

22.     Though both Air Wilmington and Wilmington General are registered as active through the North Carolina Secretary of State's Office, only Air Wilmington shows up on the ILM website as an FBO. Air Wilmington has been on the field at ILM since 1975 in some capacity, and has been owned and operated by the Cherry family the entire time.

23.     As of March 28, 2016, Air Wilmington is the sole FBO advertised on the ILM website, offering maintenance and cleaning services, charter service, fueling, flying lessons, GPU, Lavatory Service and Potable Water. Air Wilmington has the prime airport location and does not have to cross runways or taxiways to conduct business.

7

24.     The FBO who replaced ISO Aero Service/WFC, AviatMall, LLC ("AviatMall"),

managed by Brixtel Group, Inc. of Virginia ("Brixtel"), a corporation specializing in IT and

systems integration. The AviatMall brand has been used (in the past and currently) as an online

aviation supply vendor. AviatMall replaced ISO Aero Service/WFC at ILM in May of 2014,

when Aero Service's lease was terminated. AviatMall was given property owned by ISO Aero

Service/WFC, which WFC was not allowed to recover after the lease termination.

25.     AviatMall had similar problems with ILM as Jetstream and Aero Service, and closed in

less than a year for what the airport reported as failing to meet the airport's minimum standards

and defaulting on its rent payments.

26.     In order to induce I.S.O. Aero Service to relocate to ILM, the Airport Authority made

promises and guarantees to I.S.O. Aero Service and Ken Vojta, some pertaining to the

improvement of the aircraft parking ramp, redevelopment of a closed taxiway, and a partial

relocation of a parking lot.

27.     The Airport Master Plan update in 1997 included proposed developments that would

address issues I.S.O. Aero Service had with a taxiway and access ramp. These improvements

were included when ILM sought funding from the Federal Aviation Administration ("FAA") and

the North Carolina Department of Transportation ("N.C. DOT"). The update of the ILM Master

Plan included a permanent taxiway between Runway 24 and the I.S.O. Aero Service ramp, as a

Phase II addition, and other developments in each of the five-year phases.

28.     I.S.O. Aero Service was also promised the right to ingress and egress over the roads and

taxiways, which was written into the lease agreement with I.S.O. Aero Service on November 5,

1990. This commitment was not honored.

29.     I.S.O. Aero Service agreements were ignored and Airport Authority and ILM agents or employees promulgated policies which caused injury to Aero Service and giving Air Wilmington more and more of the General Aviation business.

**A.  The Fuel Truck policies that unjustly discriminated against Aero Service**

30.     I.S.O. Aero Service operated on the South side of ILM with a satellite operation on the North side, and required access to taxiways and runway crossings in order to economically compete with Air Wilmington. The I.S.O. Aero Service fuel farm was located on the South ramp which was why the ingress/egress agreement was placed into the lease.

31.     I.S.O. Aero Service could service the Air Carrier ramp without crossing runways from the North ramp operation by access to the taxiways, but the Airport Authority would not allow access via the taxiways. For a period of five years from 1990-1995, the Airport Authority unjustly prohibited Aero from accessing the airport via airport roads and taxiways by telling I.S.O. Aero Service and Vojta the access was prohibited as against FAA regulations, which was incorrect and untrue.

32.      The Fuel Truck Policy released in August of 1995 required that all fuel trucks meet all N.C. DOT regulations as if the trucks were operated on the public roadway, with functioning strobe lights, a working radio, drivers trained and licensed to drive fuel trucks as well as certified by the Airport Authority, and an Airport Public Safety Office ("PSO") vehicle escort.

33.     The 1995 Fuel Truck Policy also allowed the Airport Director to ban an FBO from traversing the runway/taxiway areas, with no clear procedure on how bans would be decided or appealed. The policy only affected I.S.O. Aero Service, as Air Wilmington could service all of its customers without access to the movement area that includes the runways and taxiways. After the implementation of the policy, I.S.O. Aero Services confirmed that I.S.O. Aero Service's fuel

trucks had access to access the runway and taxiway movement areas and were told the trucks were approved as long as there was an escort from ILM. ILM decommissioned half of taxiway F so Air Wilmington Trucks did not need to pass through a double gate, crossing the driveway to the PSO building.

34.     In April of 2004, the Airport Authority released an "Airfield Incursion and Surface Incident Guidelines" policy, which had an effective date of February 2004. This policy allowed the Airport Authority to suspend or revoke driving privileges for FBO employees involved in an incursion or surface incident.  FBO employees had to agree to this policy in order to get the approval for driving privileges.

35.     At a February 2005 meeting, Airport Director Rosborough announced, in a discussion about runway incursions, that there would be no fuel trucks crossing the runways in the future. When a meeting attendee asked Rosborough if that meant I.S.O. Aero Service would have to go, Rosborough agreed.

36.     On October 11, 2005, I.S.O. Aero Service was notified by memorandum that due to incursions on the airfield, ILM was prohibiting fuel truck movement on the runways and taxiways. The memo stated the "FAA has strongly recommended that we stop all fuel truck movement on active runways/taxiways." The memo explained the policy was a result of the local FAA Safety Team meeting, and all fuel trucks would be prohibited from crossing any runway or taxiway effective January 1, 2006.  The prohibition did not come from the FAA Safety Team.

37.     Airport Director Rosborough stated in the memo the change was due to a runway incursion on September 23, 2005. This incident involved a fuel truck crossing the runway without authorization. This incursion was not an I.S.O. Aero Service vehicle, though the resulting ban only impacted I.S.O. Aero Service. This incursion also happened long after the

10

February meeting in which Director Rosborough announced he would be stopping fuel trucks, which meant I.S.O. Aero Service would have to go.

38.     With the fuel storage at the South Ramp and the fuel sales on the North Ramp, the ban required I.S.O. Aero Service to hire a CDL with hazmat training to drive a truck in city traffic with 2400 gallons of aviation fuel. For Aero Service to make the trip across to the South side via public highways an additional 14 miles per trip would be necessary, at a cost of $25,000-30,000 per year, which added to operating expenses.

39.     The prohibition on fuel trucks in runways and taxiways only affected I.S.O. Aero Service. Air Wilmington's has the prime FBO leasehold and their fuel farm is on the same leasehold as the Air Wilmington FBO, so Air Wilmington did not have to cross taxiways or runways to fuel aircraft.

40.     In 2011, an aviation consultant hired by I.S.O. Aero Services reviewed the incursion data from the FAA Aviation Safety Information Analysis and Sharing ("ASIAS") database. Pelican Aviation Consulting, Inc. ("Pelican Consulting") found there were 16 incursions from 1991 to 2011, including all aircraft and vehicles. Of these 16 incursions, three were vehicle incursions.

41.     The most serious vehicle incursion was a rescue vehicle incursion on February 3, 2004. There was one incursion by an I.S.O. Aero Service's driver who crossed the hold short line and had to back up to get behind the line, occurring on January 9, 2003. One incursion was an Air Wilmington truck that crossed the runway entirely without authorization, when the driver got confused about the hand signals the escort vehicle driver was using, which happened September 23, 2005. That the escort vehicle was using hand signals implies the Air Wilmington truck did not have a working radio, as was required in the Fuel Truck Policy.

42.     In reviewing the information, Pelican Consulting found the 2003 I.S.O. Aero Service incident was reported in detail. The report identified the vehicle number (following the incursion policy in effect at the time), and noted the driver had his driving privileges suspended and was required to go through driver re-training, per the Fuel Truck policy.

43.     The Air Wilmington incident report did not include the identity of the vehicle or driver, nor did the report on the incursion by an Airport rescue vehicle. The airport vehicle incursion report and Air Wilmington's report additionally gave no details about whether the drivers' privileges were suspended or if the drivers were required to go through re-training, as the I.S.O. Aero Service report did, and as was required per the Fuel Truck Policy.

44.     I.S.O. Aero Service hired an additional consultant, Wheeler & Associates, Inc. ("Wheeler"). On July 19, 2011, Airport Director Wilsey and Deputy Director Broughton (then Operations Director) met with Wheeler consultant Don Wheeler and Reynold Bishop from Pelican Consulting. The meeting was for Wheeler and Bishop to present the findings from both consultants' review of I.S.O. Aero Service and ILM activity. The review covered a twenty year period and targeted fuel truck operations and aircraft servicing on the U.S. Customs parking apron; an area where aircraft are parked, unloaded, loaded, refueled or boarded and is typically more accessible than the runway.

45.     In this meeting, Broughton stated to both consultants that Anna Cohen ("Cohen"), the manager of the southern region runway safety program at the FAA, directed ILM to shut down the fuel truck operation on the runway. However, when Bishop spoke to Cohen at the FAA, Cohen stated she did not know either Broughton or Wilsey and she would not have directed them to shut down fuel operations, as she had no regulatory authority to do so.

12

46.     When Bishop discussed the ILM incursion history at the airport with Cohen, Cohen stated the three vehicle incursions were more than reasonable and offered the suggestion that ILM just follow the approved procedure in the ILM Part 139 Certification Manual.

47.     In a discussion of the problem with Airport Director Rosborough and Broughton on August 12, 2011, Rosborough challenged the consultants when the consultants asked to meet with the Airport Authority. Rosborough explained to the consultants the Airport Authority did not confirm or verify any information which Rosborough presented and asked if the consultants thought the Airport Authority would be more likely to believe the consultants or the airport director if the information was presented to the Airport Authority.

B.     **Airport Actions and Policy making it economically impossible to operate a second FBO at ILM**

48.     I.S.O. Aero Service and ILM agreed in the original lease for Aero Service to have ingress and egress over the roads and taxiways established at ILM. For the first five years, I.S.O. Aero Service was not allowed to use the runways or taxiways at all, then in 1995 ILM finally agreed to allow Aero Service the use of the roads and taxiways, but with very limiting restrictions. I.S.O. Aero Service complied with the 1995 fuel truck policy, by training Aero Service drivers and acquiring the required Airport escorts.

49.     After the initial fuel truck policy was enacted in 1995 which required FBO drivers to be certified by the PSO, I.S.O. Aero Service sent drivers to receive the training. On October 28, 1995, an I.S.O. Aero Service's employee attending driver training at the airport PSO was advised that the PSO had been instructed to make it as hard as possible for I.S.O. Aero Service's employees to pass the training course.

50.     On November 13, 2000, then Interim Airport Director Rosborough released a memorandum updating the rules for the apron where the U.S. Customs office was located. In the

13

memo Rosborough stated he met with Wilsey (who was then the Director of Engineering and Facilities) and others to discuss concerns about the FBO operations on the Customs ramp. The memo stated the new policy was written to solve those concerns and was approved by the U.S. Customs and Airport Administration.

51.     The Rosborough memo included a policy titled "Policy and Procedure and MOU" ("the Customs policy"), which was not signed by anyone in U.S. Customs and Airport Administration. The Customs policy required Customs officials to inquire if fuel was needed and determine which FBO the pilot wanted to refuel with, then restrict the ramp to just that FBO. If the pilot had no preference of FBO, after landing, the pilot could call one of the FBOs' numbers which were posted on signs located in the Customs office. The Customs policy prohibited FBO literature or other information in the office or in the restricted area of the North Ramp.

52.     The Customs policy also prohibited aircraft passengers from walking to an FBO from the Customs apron, and required the FBO to drive passengers off the ramp in an FBO vehicle; this clause in the policy was directly related to Air Wilmington's location to the Customs Ramp, since pilots or passengers could easily walk to Aero Service from the Customs apron.

53.     During the Pelican Aviation Consulting Review in 2011, Reynold Bishop called and spoke with Wilmington U.S. Customs Supervisor Cary Becker ("Becker"), who was responsible for ILM in 2011. Becker advised that he was not aware of any national policy on aircraft refueling and there was no "SOP" or "MOU" detailing how FBOs were treated, as it was dependent on local port policy.

54.     In 2003 and 2004 ILM was also in the process of soliciting Request for Proposal ("RFP") bids for an FBO to build new structures and operate an FBO in the prime area Air Wilmington was currently placed. This was due to Air Wilmington's lease expiring for that space.

55.     The RFP required the FBO to agree to $2 Million in capital improvements to the Air Wilmington FBO area, but would not allow the FBO to operate until all the capital improvements were complete. As Air Wilmington has two leaseholds, they were the only company who could afford to bid. Air Wilmington could continue operations in their second leasehold while the construction was underway and therefore continue earnings to pay for capital improvements.

56.     On April 7, 2004, Rosborough sent a memorandum to the Airport Authority that was marked with the handwritten note "Not for Ken's Eyes" (referring to Ken Vojta of I.S.O. Aero Service). This memo pertained to the renewing of I.S.O. Aero Service lease agreement.

57.     In the April 7, 2004 memo, Rosborough stated I.S.O. Aero Service had the right to renew their lease, but argued there may be problems with I.S.O. Aero Service. Rosborough stated there was an audit of FBO payments to the Airport, and I.S.O. Aero Service may have underpaid fees to the Airport Authority.

58.     The April 7, 2004 memo also contained Rosborough's statement that trucks used to escort I.S.O. Aero Service across the airfield were getting expensive, as the escort added costs to ILM and disrupted security mandates. Rosborough neglected to inform the Airport Authority the escort trucks were only needed due to the ILM promulgated policy requiring escort trucks, and that the policy only impacted I.S.O. Aero Service.

59.     Rosborough's second "Not for Ken's Eyes" memo requested the Airport Authority offer the lease extension with a requirement to either build an additional fuel farm or pay for all escort trucks, to be reimbursed at an unnamed rate.

60.     This "Not for Ken's Eyes" Rosborough memo also included the airfield incursion issue. In the memo, Rosborough told the Airport Authority ILM had an "unhealthy track record" of

incursions. Rosborough then blamed I.S.O. Aero Service for three of those incursions, even though Rosborough presented no information to support such a claim, and I.S.O. Aero Service was only responsible for one incursion, the most minor vehicle incursion. The other two vehicle incursions were the fault of Air Wilmington and ILM employees.

61.     On October 11, 2005, I.S.O. Aero Service received a Rosborough memorandum stating due to incursions on the airfield, the "FAA has strongly recommended that we stop all fuel truck movement on active runways/taxiways." The memo explained the new policy was a result of the local FAA Safety Team meeting, and stated all fuel trucks were prohibited from crossing any runway or taxiway effective January 1, 2006.

62.     Rosborough stated in the third memorandum the further change in policy was due to a runway incursion on September 23, 2005. That incident involved a fuel truck crossing the runway without authorization. That incursion was not an I.S.O. Aero Service vehicle, though the resulting ban only impacted I.S.O. Aero Service.

63.     In November of 2005, when pilot Mark Boudreau spoke to a newly appointed Airport Authority Member, the Board Member stated he was already persuaded to close down I.S.O. Aero Service and have only Air Wilmington on the field.

64.     In December of 2005, Cherry's two FBO's, Air Wilmington and Aeronautics, merged under the Air Wilmington name. At the same meeting where this change was announced to the Airport Authority, Rosborough announced that I.S.O. Aero Service would have to go.

65.     In 2005, I.S.O. Aero Service was having difficulty meeting the rent payments, due in large part to the Airport Authority's actions. I.S.O. Aero Service President Kenneth Vojta ("Vojta"), met with the Airport Authority to arrange additional time to pay the debt owed for

rent, and assured the Airport Authority Board Members that I.S.O. Aero Service was invested in being at ILM.

66.     When Vojta left the meeting, he believed the Airport Authority had approved his plan to liquidate assets to pay the rent that was in arrears, and had given Aero Service time to do so. Vojta acted with that understanding, until his lease was suddenly terminated in mid-2005 by ILM.

67.     When I.S.O. Aero Service requested information from ILM on other tenants who had been in arrears on rent, I.S.O. Aero Service was told it would cost $6,000.00 for ILM to provide that information. At that point, Vojta borrowed the money to bring I.S.O. Aero Service's account up to date. However, the Airport Authority had already terminated I.S.O. Aero Service's lease and put I.S.O. Aero Service on a month-to-month lease agreement.

68.     The Airport Authority offered a new long-term lease agreement, but that agreement required I.S.O. Aero Service to release the Airport Authority from liability for any past or future actions by ILM or any of its agents. As I.S.O. Aero Service could not agree to such an all-encompassing blanket liability waiver, the company remained on the month-to-month lease.

69.     In January 2006, the Airport Authority signed a thirty-year lease with an additional ten-year add-on, with Air Wilmington and Cherry. That lease included a clause stating Air Wilmington would make $2 Million worth of improvements, including a general aviation terminal, a parking lot, hangars, and a new fuel farm.

70.     This Air Wilmington lease included the right to use the ramps, taxiways and runways. The lease was for 1,045,440 square feet (24 acres) and included a ramp area, unimproved area, and various buildings located in the leasehold. Under Air Wilmington's new lease, the rent for

Hangar 24 was zero the first ten years, then $1.96 per square foot after January 2016; fuel flowage fees were for $0.07 per gallon on all fuel sales.

71.    In August of 2006, Stanley Holmes ("Holmes") was delivering a check to the main Airport office, and had to wait for Rosborough, who was on the phone. Holmes overheard Rosborough state that there were two FBOs at ILM, one which was doing a great job and the other that was run by someone with a "little Napoleon attitude." Holmes felt Rosborough was clearly favoring Air Wilmington over I.S.O. Aero Service, as the rest of the conversation sold Air Wilmington and insulted I.S.O. Aero Service.

72.    In September of 2006, I.S.O. Aero Service received a report by Wheeler on the review of correspondence and business files to determine if I.S.O. Aero Service was being treated fairly by the Airport Authority. Wheeler's report stated he found a pattern of actions by the Airport Authority leading to a negative, if not hostile, environment directed at I.S.O. Aero Service and Vojta.

73.    Wheeler found the June 2005 lease offer, which required the liability waiver for all past and future actions, to be a constructive refusal to renew the lease, and the fuel truck policies economically discriminatory.

74.    In June of 2011, Pelican Consulting provided an up-to-date report for I.S.O. Aero Service, reviewing materials from 1990 to 2011 to determine if Aero was being treated fairly by ILM. This report, too, found unfair practices and unjust policy enforcement that impacted I.S.O. Aero Service and not Air Wilmington.

75.    On July 15, 2011, I.S.O. Aero Service worked with flight N2383C to provide in-flight technical assistance. When the plane made a "gear-up" landing on Runway 6 ("RWY 6"), Air Wilmington was selected by airport staff to provide recovery services even though I.S.O. Aero

Service had already been providing assistance. Both the Air Traffic Control Tower Chief and the plane's pilot advised I.S.O. Aero Service they were not involved in the selection of the FBO to recover the plane.

76.     Both Pelican Consulting and Wheeler concluded that the activity by Rosborough, the Airport Manager, and the Airport Authority either directly or indirectly caused unjust and unfair treatment to I.S.O. Aero Service over Air Wilmington.

77.     Both Pelican Consulting and Wheeler came, separately, to the same opinion, that though the Airport Authority could keep a secondary FBO on site (at the time I.S.O. Aero Service), the Airport Authority's actions and policies minimized a secondary FBO's effectiveness and ability to compete with Cherry's FBO, Air Wilmington.

78.     On August 15, 2011, Pelican Consulting filed an informal report of violation with the FAA, under 14 C.F.R. § 13.1, against ILM. This report included both consultants' opinions pertaining to the Airport Authority's actions and unequal treatment of I.S.O. Aero Service.

79.     On September 11, 2011, Pelican Consulting submitted an addendum to their August 15th report, with more items supporting the complaint that ILM violated Grant Assurance 22 of the Airport Sponsor Grant Assurances. At that point, all I.S.O. Aero Services wanted was a chance to negotiate for a lease in good faith with the Airport Authority, in a neutral and objective environment, without the discrimination experienced in the past by Aero Service.

80.     By February 27, 2012, the informal complaint was evaluated by the FAA, and the Airport Program Manager William C. Garrison ("Garrison"), responded with his opinion that ILM was not in violation of any grant assurance due to I.S.O. Aero Service's month-to-month lease, even though the month-to-month lease was a result of the actions taken by ILM.

81.     Vojta and I.S.O. Aero Service continued to try to work with ILM, requesting a just and equal treatment of ILM's FBOs.

82.     In December 2012, Mr. Tremblay met with Vojta to work out an agreement to relieve Vojta from I.S.O. Aero Service's day-to-day operations.

83.     In January 2013, Mr. Tremblay, by and through WFC, began operating ISO Aero Service/WFC in the I.S.O. Aero Service leasehold. WFC bought the assets of I.S.O. Aero Service, leaving Vojta as leaseholder only.

84.     In February 2013, Mr. Tremblay met with Airport Director Rosborough to introduce himself as the new General Manager for ISO Aero Service/WFC and introduce WFC Management. In this meeting, Mr. Tremblay stated he wanted to "bring back the general aviation community to ILM," and Rosborough responded with the statement "there was no room at ILM for more than one FBO."

85.     The Airport Authority failed to recognize WFC as a separate entity from Vojta's I.S.O. Aero Service, despite WFC's performance of duties as a management company.

86.     In April of 2013, Mr. Tremblay met with Deputy Director Wilsey about ILM's detour of taxiway Alpha for four weeks to allow for construction on taxiway Charlie; this closure, in practicality, blocked most of the access to ISO Aero Service for business, to all but the most loyal of customers.

87.     To reach ISO Aero Service/WFC during the construction, a plane would have been required to turn down a closed runway, pass barriers with flashing lights, then turn again at a taxiway with flashing barriers. However, to reach Air Wilmington, a pilot would just turn on the next taxiway, which had no flashing lights.

88.     In the April 2013 meeting, Wilsey refused to provide WFC a reduction on the ISO Aero

Service/WFC rent, even though access to the building was partially blocked. Wilsey informed

Mr. Tremblay the ISO Aero Service/WFC building would still have to be fully staffed during the

construction closure. Wilsey told Mr. Tremblay any difficulties experienced by ISO Aero

Service/WFC were not ILM's problem. The construction closure lasted for six weeks, blocking

nearly all access to ISO Aero Service/WFC and causing severe monetary loss.

89.     In June 2013, Aviation Consultant Mark Chambers ("Chambers") presented findings to

the Airport Authority regarding General Aviation at the Airport Authority, indicating that the

two FBO situation was effective at providing choice at both ends of the aviation market; Air

Wilmington was willing to invest in improvements and services like turbine aircraft and piston

powered aircraft in newer facilities, and ISO Aero Service/WFC catered to both turbine and

piston aircrafts in a split operation that provided smaller General Aviation aircraft owners a

lower cost option.

90.     In September 2013, a potential WFC investor was told by Rosborough that ISO Aero

Service/WFC would not succeed, and therefore the investor should speak to Cherry, the other

FBO owner.

91.     October 15, 2013 Board Member Crane notified Mr. Tremblay the Airport Authority was

going to terminate I.S.O. Aero Service's lease, and that WFC could do an RFP for the leasehold.

Crane told Mr. Tremblay that Air Wilmington spent $100,000.00 on their own RFP, so WFC

should do a similar RFP.

92.     Plaintiffs are informed and believe during a special Airport Authority meeting in October

2013, Cherry informed the Airport Authority that ISO Aero Service/WFC was required to meet

the same minimum standards on a month to month lease as it was required under a 40 year lease. Subsequently, WFC requested a long-term lease.

93.    On October 17, 2013, ISO Aero Service/WFC received notice from the Airport Authority that Minimum Standards required $5 Million in hangar-keepers insurance. However, the lease I.S.O. Aero Service received from Wilsey only required $2 Million in insurance.

94.    In November 2013, then Vice-Chairman Crane informed Mr. Tremblay that an RFP was necessary to terminate the month-to-month lease for I.S.O. Aero Service, because Air Wilmington had spent $100,000.00 on their RFP, though an RFP is not required under the FAA Airport Compliance Manual 5190.6(B) ¶ 8.7(B).

95.    On November 13, 2013, an Army Gulfstream V ("GV") aircraft became disabled on the South Ramp of the airport, and arrangements were made for hangar space at ISO Aero Service/WFC to allow the Army to work on the plane. However, the Airport PSO towed the plane from ISO Aero Service/WFC to Air Wilmington, saying that Air Wilmington had a government contract for Army planes.

96.    However, Air Wilmington had a government contract for fuel in government planes only, not space for repair. The Airport PSO's denial of business to ISO Aero Service/WFC caused a substantial revenue loss for ISO Aero Service/WFC.

97.    On December 17, 2013, Mr. Tremblay was contacted by ILM employee McKinley Smith asking for Mr. Tremblay to meet with Rosborough in Rosborough's office. When Mr. Tremblay inquired as to an agenda for the meeting, then-Operations Director Broughton interrupted the conversation, stated it was a meeting with Wilsey, Rosborough, and Air Wilmington owner Cherry, but gave no information about the agenda.

98.     Mr. Tremblay requested the meeting be rescheduled, so WFC could schedule the meeting with their lawyer in attendance. Mr. Tremblay was later informed Rosborough reported to the Airport Authority WFC *refused* to meet about an RFP for the space. It was never explained to Mr. Tremblay why the owner of the other FBO (Cherry) would be involved in a meeting about WFC's RFP.

99.     In January of 2014, one Board Member complained about the treatment of ISO Aero Service/WFC, stating he felt ILM needed FBO competition, and that Cherry wanted the airport all to himself.

100.    Further, in January 2014, WFC was considering ending its arrangement with Vojta as leaseholder, but Airport Management spoke to WFC encouraging them to stay with ISO Aero Service/WFC. As ILM had expressed support for WFC, the Tremblays invested personal funds in the business to ensure it remained open, as business funding was impossible to find due to I.S.O. Aero Service's month-to-month lease.

101.    In February 2014, WFC decided to execute a proposal on the RFP, even though the Airport Authority required the proposal to include $100,000.00 a year in property improvements and approximately $9,000.00 a month in rent for five years. Though Air Wilmington had a 40 year lease, the Airport Authority would only accept a five-year lease for WFC's proposal. WFC agreed to five years but requested comparable lease terms to Air Wilmington in order to obtain commercial financing.

102.    WFC submitted a proposal to provide general aviation services at ILM on March 11, 2014, which was signed for by ILM Agent Phyllis Stevens. On March 12, Mr. Tremblay received a letter from Gary Broughton asking for clarifications on items in the WFC proposal, to which WFC responded by letter on March 19, 2014.

103.     March 18, 2014, Tobin Geatz ("Geatz") told Mr. Tremblay that Board Member Barber
(who was Chairman at the time) was complaining WFC would not respond to the RFP correctly
as it was an RFP for a Specialized Aviation Service Operator ("SASO"), not an FBO. Mr.
Tremblay was advised to turn in an RFP for a non-fuel pumping operation, so he would not
conflict with the Bill Cherry's FBO.

104.     In April of 2014, a pilot, Mr. Singer, landed at the North Ramp facility at 10:30 pm. It
had been the practice of the ILM PSO to let late arrivals out through the gate, however the PSO
told Singer the PSO could not let Singer out of the gate, as the PSO did not want to be involved
with "FBO business."

105.     Singer and his young daughter were trapped inside the fence until a maintenance person
came by forty-five minutes later. When Singer complained, an ILM employee told Singer that
egress from the airport was FBO responsibility. Up until this point, the PSO had always helped
late arrivals out of the gate if the FBO was closed.

106.     In April of 2014, the Airport Authority considered the proposals to replace I.S.O. Aero
Service month-to-month lease. During the meeting to discuss the FBO, Board Members voted in
a three to two split (on a five member board at that time). Board Members Al Roseman and
Carter Lambeth voted against replacing ISO Aero Service, and Board Members Barber, Perritt
and Crane voted to replace ISO Aero Service.

107.     WFC submitted a proposal to do business as WFC Management, as a separate entity from
I.S.O. Aero Service, but was not recognized as an independent bidder for the RFP and was
rejected by the Airport Authority.

108.    The WFC proposal suggested a thirty-year lease, to be more equitable to Air Wilmington's operation, which would allow WFC to obtain financing to support the expansion required by the Airport Authority RFP to be included in the proposal.

109.    WFC's proposal included a FBO on the North Ramp, with hangars and a SASO to be constructed on the South Side, to conduct the flight training and have long-term tie-down space. The proposal included a subcontract for the maintenance, which was required in the bid as there were a large amount of repair shops in a fifty-mile radius around ILM.

110.    The WFC proposal clarified WFC would not assume ownership of the existing fuel farm until the area could be inspected by the EPA, as WFC did not want to assume liability for the I.S.O. Aero Service fuel farm and surrounding area until testing could be done.

111.    The WFC proposal was rejected. Then-Chairman Barber stated that WFC had not filed a proposal for the RFP, even though ILM agent Phyllis Stevens signed for the proposal on March 11, 2014 at 1:15 pm, and Broughton sent follow-up questions on the proposal.

112.    Plaintiffs are informed and believe Chairman Barber did not want ISO Aero Service/WFC pumping fuel in conflict with Air Wilmington; Barber had publicly expressed an intent to remove ISO Aero Service/WFC by the end of April 2014.

113.    The Airport Authority chose AviatMall's bid for the RFP and peremptorily evicted I.S.O. Aero Service and ISO Aero Service/WFC from the airport property.

114.    In April 2014, during the Airport Authority's Regular Public Meeting, Chairman Barber asserted that AviatMall wanted to be an FBO on the airfield, have a Part 145 repair station, do pilot training, meet ILM minimum standards, and invest capital into the facility; even though at that point AviatMall was an on-line aviation supply vendor with no FBO experience.

115.    Toward the end of April 2014, then-Chairman Barber scheduled a special Airport

Authority meeting to remove Board Member Roseman (who voted against the majority of Board

Members for a renewal of the I.S.O. Aero Service lease). The meeting was canceled two days

later.

116.    Plaintiff is informed and believes there were between fourteen (14) and seventeen (17)

local pilots and pilot organizations who were very upset with I.S.O. Aero Service's lease

termination and the eviction of ISO Aero Service/WFC, and complained to the Airport

Authority, but were ignored.

117.    A 30-day notice of I.S.O. Aero Service's lease termination was sent May 1, 2014 to

Vojta, not Mr. Tremblay and WFC. The letter stated Vojta's lease would expire May 31, 2014,

and pursuant to the lease, Vojta would need to set a date and time for ILM staff to inspect the

facilities. The notice gave Vojta ninety (90) days to remove the terminal building on the North

Ramp and secure the security fence along the ramp area.

118.    However, on May 20, 2014 at 9:45 pm, an Airport Police Officer went to the Tremblays'

home to deliver a letter to Vojta and Mr. Tremblay and request their signatures. The letter

claimed two (2) security violations had been found, and therefore, ISO Aero Service/WFC

needed to leave the property by May 21, 2014 at 5:00 pm – only 18 hours after the home visit

and ten (10) days prior to the date on the official notice of lease termination. This letter stated

any property not removed by 5:00 pm on May 21, 2014 would be placed into storage for thirty

(30) days, and after thirty (30) days, it would be considered abandoned by WFC.

119.    Mrs. Tremblay answered the door to the Airport Police Officer, and she was unsettled by

the Officer's presence, so late at night, so she did not sign this letter.

120.     The two (2) alleged safety violations were issued by ILM agent McKinley Smith to ISO Aero Service/WFC on May 19, 2014 and May 20, 2014. The first alleged violation stated ISO Aero Service/WFC allowed two unescorted transient aviation customers access to the Air Operation Area ramp at Aero Service South. The second alleged violation stated ISO Aero Service compromised the security of the Air Operation Area by leaving the access door from the public area unsecured. Both alleged violations were made to look like TSA Violations of 42 CFR §1542, detailing airport security, however both charges were believed to be fictitious, and when TSA was contacted about the violations, TSA could not confirm any violations.

121.     The ejection notice only gave 18 hours to move out all the furnishings and equipment, however, it promised that ISO Aero Service/WFC furniture and equipment would be stored for thirty (30) days for WFC to pick-up. No property was stored by ILM for any period of time in violation of the promise in the ejection notice.

122.     All property not moved by May 21st was confiscated. Some property was given to AviatMall, and some was thrown in the trash; Plaintiffs were not permitted back onto the property to retrieve property or clean up.

123.     Specifically, ISO Aero Service/WFC were not permitted to retrieve or sell remaining fuel, and were forced to leave the fuel behind, thereby incurring financial loss. Additionally, due to the summary eviction, ISO Aero Service/WFC were denied the remote for a Prist fuel truck (rendering the truck useless) as well as office furniture, adding to the financial harm.

124.     Plaintiffs are informed and believe the eviction occurred on May 21 so that AviatMall could hold a customer meeting at the airport, without an ISO Aero Service/WFC presence.

125.    Mrs. Tremblay went to the hanger on May 21, 2014, at 5:00 pm and found the gates and door locks had already been changed. She was required to be escorted onto the property and was watched while she was on the airport grounds.

126.    The Airport Authority continued to disparage ISO Aero Service/WFC, to Plaintiff's detriment, even after the lease period ended.

127.    Plaintiff is informed and believes on May 24, 2014, an aircraft crashed, and the ILM Operations Director publicly reported the aircraft had departed from ISO Aero Service. By May 24, 2014, ISO Aero Service had already been evicted, having been given until 5:00 pm on May 21, 2014 to remove all its belongings.

128.    Mr. Tremblay has been prohibited from doing flight training at ILM, as ILM inserts into contracts for tie down or hangar rentals on the South Ramp a term prohibiting flight training.

129.    In February 2015, the building at 1820 Flightline Road belonging to ISO Aero Service/WFC was demolished. Plaintiffs received no compensation for the building when the lease was terminated, when they were ejected, or when the building was demolished.

130.    Even though AviatMall moved onto ILM in June of 2014, by April of 2015 AviatMall was already in trouble with the Airport Authority. In March of 2015, the Airport Authority issued a 30-day compliance notice to AviatMall stating the business had been found non-compliant with minimum standards, so AviatMall had thirty days to come into compliance or ILM would take steps to terminate the lease.

131.    In a newsletter sent in April 2015, AviatMall notified customers and tenants that AviatMall would be departing from ILM immediately, due to the difficulties that AviatMall encountered with the Airport Authority. Though the letter did not detail AviatMall's complaints, the letter noted that AviatMall, too, had tried to work with the Airport Authority to receive a fair

opportunity to have a viable business at the South Ramp, but the Airport Authority had other business intentions for the South Ramp area.

132.     The Airport Authority, on or around April 13, 2015, issued a notice to AviatMall that AviatMall had thirty days to vacate the building.

133.     Up through August of 2015, whenever pilots attempted to confer with the Airport Authority about the Plaintiffs, the pilots were told the Plaintiffs did not pay their bills, which is untrue. The pilots were also told Plaintiffs left without cleaning the property, though Plaintiffs were unable to do so because of the eviction and the change in the locks.

   **C.  Alleged fuel contamination in the South Ramp area**

134.     Prior to I.S.O. Aero Service's lease being cancelled, the Airport Authority did soil contamination testing around the fuel tanks located in the I.S.O. Aero Service Leasehold on March 31, 2014.

135.      At the July 2014 meeting, Roseman asked why that particular area was tested at that particular time, and Wanda Copley ("Copley"), Counsel for the Airport Authority, stated that any new tenant would want soil testing done, so the testing was done "in anticipation" of a request from the new tenant.

136.     Roseman inquired about how often tanks were inspected for spillage, and Wilsey stated that ILM firefighters inspect the tanks quarterly for safety reasons, and that the ILM staff inspect ILM sites twice a year for safety issues.

137.     Even though WFC had made clear to the Airport Authority that WFC would not take responsibility for the fuel farm until the area had been tested and cleaned, on August 5, 2014, Copley sent a letter to WFC alleging that WFC was liable for soil contamination for the fuel tanks for the time period of May 7, 2014 through May 23, 2014. The letter claimed the

contamination costs were in excess of $25,000.00, and added to that amount alleged claims for rent and premise repairs in the amount of $15,237.72.


### FIRST CLAIM FOR RELIEF
### DISPARATE TREATMENT UNDER 42 U.S.C. §1983

138.    Plaintiffs re-allege and re-incorporates paragraphs 1 through 137 as if more fully set forth herein.

139.    Defendants are "persons" as that term is used in the text of 42 U.S.C. §1983.

140.    Defendant Airport Authority, ILM Airport Director Wilsey in her current and previous positions, and Deputy Director Broughton in his current and previous positions, have engaged in a pattern of conduct, acting individually and in concert, to deprive Plaintiffs of their equal protection rights as guaranteed by the United States Constitution through the Fourteenth Amendment and Article I, §19 of the North Carolina Constitution.

141.    Plaintiffs were similarly situated to the other FBO at ILM, in that both FBOs provided similar services to the general aviation users at ILM, basic support services for airplanes, including fuel operations.

142.    Airport Director Wilsey, in her current and previous positions, and acting individually and in concert with the Board Members and other ILM employees, has engaged in a pattern of conduct to deprive Plaintiffs of their equal protection rights, through malicious acts intended to harm Plaintiffs and benefit Bill Cherry's competing FBO, including, but not limited to:

   a.    Aiding and assisting in the writing and promulgating airport policies which unjustly advantaged Cherry's FBO, including, but not limited to: the Customs Policy which prohibited aircraft passengers from walking on the customs ramp, or

30

the requirement that Plaintiffs be open during the taxiway construction, though that construction partially blocked the taxiway to the ISO Aero Service/WFC building;

b. Executing policy and procedures or unofficial customs of the Airport Authority, by enforcing the discriminatory policies written by others, as stated in the facts above, causing financial injury and property loss;

c. Personally demanding WFC fully staff ISO Aero Services/WFC during the six (6) weeks of construction, which blocked the ISO Aero Service/WFC building, and when approached about a reduction in rent due to the financial impact, telling Mr. Tremblay that it was not ILM's problem;

d. Aiding and assisting in planning a meeting with WFC which was allegedly about WFC's RFP for the FBO space, which Wilsey and Rosborough were allowing Bill Cherry to attend; and

e. Approving by act or omission the actions of ILM employees and agents who she managed and supervised, in discriminatory actions unjustly harming the Plaintiffs and benefitting Cherry's competing FBO, including, but not limited to: allowing planes to be towed to Air Wilmington instead of I.S.O. Aero Service; unjustly evicting I.S.O. Aero Service; and allowing the destruction of ISO Aero Service/WFC property after the eviction instead of storing the property properly.

143.   Defendant Broughton, in his current and previous positions, and acting individually and in concert with the Board Members and other ILM employees, has engaged in a pattern of conduct to deprive Plaintiffs of their equal protection rights, through malicious acts intended to harm Plaintiffs and benefit Bill Cherry's competing FBO, including, but not limited to:

a. Informing consultants hired by I.S.O. Aero Service that the fuel truck policies promulgated by Broughton, which harmed Plaintiffs and benefited Cherry's FBOs, were at the direction of the FAA, even though Cohen, the FAA manager of the southern region runway safety program at the FAA stated she had not directed the policy and in fact had no regulatory authority to do so;

b. Participating in planning the meeting with Plaintiffs relating to WFC's proposal for the RFP, allowing competing FBO owner Bill Cherry to the meeting;

c. Stating at the Airport Authority Board Meeting that he was strongly encouraged by the FAA to hold off on any revisions of Airport Minimum Standards due to issues ongoing with the previous FBO, meaning ISO Aero Service/WFC, continuing the fiction started by Rosborough that the FAA supports the actions taken against ISO Aero Service/WFC;

d. Aiding and assisting in writing and promulgating policies unfairly detrimental to Plaintiffs and advantageous to Cherry's competing FBO;

e. Allowing and approving, by act or omission, the discriminatory actions of ILM employees and agents, unjustly harming the Plaintiffs, and benefitting Cherry's competing FBO, including, but not limited to: allowing planes to be towed to Air Wilmington instead of I.S.O. Aero Service, and allowing the destruction of ISO Aero Service property after the unjust eviction of WFC and ISO Aero Service; and

f. Continuing to speak negatively about the Plaintiffs when questioned by the general aviation community.

144.    The Airport Authority, acting as individual board members and as the Authority itself, has by vote, approval or omission, or action ratified the actions of the ILM agents and employees Rosborough, Wilsey, and Broughton and have ratified or promulgated policies which were unjustly harmful to Plaintiffs and beneficial to Cherry's competing FBO, including, but not limited to:

    a.    Allowing, by vote, approval or omission the ratification of employees' disparate treatment of Airport FBOS, which was visible to the Airport Authority and the individual board members through complaints and discussions with the Airport Authority members;

    b.    Unjustly favoring Air Wilmington over WFC, by conduct including, but not limited to, Board Member Crane notifying Mr. Tremblay that Air Wilmington spent $100,000.00 on their RFP, so WFC should do the same even though board members told the Tremblays the bid should be for a SASO which would not conflict with Cherry's fuel-pumping operation;

    c.    Failing to recognize WFC as a separate entity from I.S.O. Aero Services, when it was beneficial to the Airport Authority, by actions including, but not limited to: denying that WFC submitted a proposal for the I.S.O. Aero Service leasehold, sending the lease termination letter to Vojta only, but treating WFC as a separate entity when sending a separate bill for the fuel contamination to the plaintiffs; or sending the PSO Officer to the Tremblay's house with the eviction notice;

    d.    Approving the closure of taxiway alpha with no reduction in rent or allowance for staff reductions during the six (6) weeks access to ISO Aero Service/WFC building was partially blocked;

e. Ignoring the reports by I.S.O. Aero Service consultants stating the actions of the airport authority were unjustly discriminating against I.S.O Aero Service to benefit Cherry's FBO;

f. Allowing individual board members and ILM employees and agents to disparage I.S.O. Aero Service, ISO Aero Service and WFC ;

g. Ratifying, by vote or omission, the policies and procedures promulgated by Wilsey, Broughton, and Rosborough, which caused financial harm to the Plaintiffs and benefited Cherry's FBO. Such ratification includes, but is not limited to:  the towing of the Army Gulfstream V aircraft to Air Wilmington and away from the Plaintiffs; the policy requiring ISO Aero Service/WFC to remain open during the taxiway closure; and the unjust eviction of ISO Aero Service/WFC, causing a substantial revenue loss;

h. Implementing, executing, and/or ratifying official policies and procedures such as the fuel truck and customs policies, with a deliberate indifference to the consequences, even when those consequences were clearly enumerated to the Airport Authority and its agents by the plaintiff, community pilots, and other Board Members;

i. Supporting actions and policies which granted an exclusive right to Bill Cherry's FBO, by driving out other competing FBOs, including, but not limited to,  Board Member Barber stating the RFP proposal for the secondary FBO spot was really for a SASO and WFC should have submitted a proposal for a non-fuel pumping operation so as not to conflict with Bill Cherry's FBO, even though the RFP was for the ISO Aero Service, Inc. leasehold which contained fuel operations;

j.   Refusing to negotiate in good faith with WFC on the FBO proposal, and denying WFC had submitted a proposal, though it was received by an ILM agent; and

k.   Promulgating by action and vote the unofficial custom, usage or practice of allowing Bill Cherry to be involved in the decisions affecting competing FBOs, including, but not limited to, allowing Bill Cherry to notify the Airport Authority of what the requirements for I.S.O. Aero Service were to meet minimum standards, even if those standards were not in the I.S.O. Aero Service lease.

145.   The Airport Authority has directed, ratified and/or approved the actions taken by Wilsey, Broughton, and ILM employees and/or agents, with actual knowledge of the actions taken by Wilsey, Broughton, and ILM employees and/or agents, and with a deliberate indifference to the consequences to Plaintiffs. Defendant Airport Authority has approved the policies promulgated by Wilsey, Broughton, and ILM employees and/or agents; directed or approved the summary ejectment of the plaintiffs; and approved the confiscation of property belonging to Plaintiffs.

146.   All Defendants have written, promulgated, implemented or executed policies which discriminate against Plaintiffs, including, but not limited to: the fuel truck policy, the customs policy, the taxiway closure policy, and RFP procedures, and the policy regarding no flight training from tie-down spaces.

147.   All Defendants have acted according to the unofficial policy, custom, or usage of favoring Bill Cherry's FBO to the exclusion of other FBOs when writing or enforcing ILM policy, and making administrative decisions or enforcing airport custom.

148.   Defendant Airport Authority, Defendant Wilsey and Defendant Broughton have either instructed ILM employees, trained ILM employees, or approved of ILM employees who support the custom or usage of harming FBOs which compete with Bill Cherry's FBO's through conduct

including but not limited, to: the actions by the Public Safety Office in enforcing policy or regulations differently; the creation of the two alleged TSA safety and security violations, which were lodged against I.S.O. Aero Service on March 19 and 20, and were created by an ILM agent or employee for the purpose of harassing ISO Aero Services/WFC thereby providing the reason to prematurely eject ISO Aero Service/WFC from ILM; and the ejectment of ISO Aero Services/WFC from ILM.

149.    Both Pelican Consulting and Wheeler Consulting agreed the pattern and practice of the Airport Authority led to a negative, if not hostile, environment against I.S.O. Aero Service, and unfair and unjust policy enforcement, negatively impacting only I.S.O. Aero Service and not Air Wilmington. This information was presented to the Airport Authority, as well as shown in Part 13 of the Informal Complaint filed with the FAA.

150.    All Defendants have been and still are aware that these policies and customs are detrimental to any FBO which competes with Bill Cherry's Air Wilmington, as Defendants have been informed individually and at Airport Authority meetings, have defended against FAA informal complaints, and have defended similar or the same actions in similar lawsuits by other FBOs attempting to compete with Bill Cherry.

151.    The Airport Authority, through New Hanover County, is vested with the power to maintain and operate the airport pursuant to N.C. Gen. Stat. §63-53. The Airport Authority is vested with the power to  govern the airport, and adopt policies, rules and regulations for the airport pursuant to Code of Ordinances, New Hanover County, North Carolina, §8-271 and 271.5. As such, Defendant Airport Authority is the final decision maker for the policies and procedures of the airport.

152.    Julie Wilsey, the Airport Director is responsible for the operation, management and
maintenance of the airport and all connected facilities, pursuant to Code of Ordinances, County
of New Hanover, North Carolina, §8-12. Gary Broughton as Deputy Airport Director assists
Julie Wilsey in her duties.

153.    All Defendants have, through their actions in the promulgation, implementation,
execution, ratification and acquiescence to the above-listed official policies and unofficial
customs of the New Hanover County Airport Authority and Airport Director, with actual
knowledge, harmed the plaintiff through (but not limited to) the loss of business, loss of business
income, the unfair removal from the airport, the termination of the I.S.O. Aero Service lease, the
refusal to allow WFC to bid on the I.S.O. Aero Service leasehold, the confiscation and
destruction of plaintiffs' property, and the continuing disparaging remarks about Plaintiffs.

154.    Defendants have consistently, for years, promulgated and enforced policies and
procedures unfairly, by taking enforcement measures against I.S.O. Aero Service, ISO Aero
Service and WFC, while allowing lenience to Bill Cherry's competing FBO, or by enforcing
policies which only impact I.S.O. Aero Services and ISO Aero Service/WFC and not Cherry's
FBO.

155.    Defendants' discriminatory enforcement and actions began before 2011 (back as far as
1996) and continue to the present, showing a pattern and practice discriminatory treatment which
includes, but is not limited to: prohibiting Mr. Tremblay from doing flight training with the tie-
down contract clauses (leaving Air Wilmington as the only option); demolishing the I.S.O. Aero
Service building with no compensation, allowing AviatMall to take and use ISO Aero Service
furniture; and throwing other ISO Aero Service property in the trash (e.g., the prist fuel remote).
The continuing acts are as recent as August of 2015, when pilots attempted to discuss ISO Aero

Service/WFC and were told Plaintiffs did not pay their bills and left without cleaning the property.

156.    Board Members and ILM employees and/or agents have shown the discriminatory actions are purposeful, intentional and malicious by statements including, but not limited to, "Aero Service has to go," "Aero Service would not succeed," or "There is no room at ILM for more than one FBO," which show the intent to harm Plaintiffs and benefit Bill Cherry's FBO.

157.    Plaintiffs were forced to leave the airport premises when they were unjustly evicted prior to the 30-day notice, required to move what property they could in under 18 hours, locked out because the gate codes and locks had been changed, and were not permitted to retrieve property (which was not properly stored, but given to AviatMall and/or thrown away), such that Plaintiffs incurred a loss of all property left behind.

158.    Defendants continue to disparage the Plaintiffs, as late as the October 2015 Board Meeting when Broughton stated that he was strongly encouraged by the FAA to hold off on any revisions of Airport Minimum Standards, "due to issues that were ongoing with the previous FBO."

159.    Despite the fact that WFC was immediately prepared to perform duties pursuant to the RFP and was sufficiently viable, equipped and knowledgeable, the Airport Director and the Airport Authority granted an RFP to AviatMall, an online aviation supply vendor, over the objections of the airport community and a minority of the board members.

160.    Defendants are aware of the clearly established law prohibiting violations of the Equal Protection Clause, arbitrary and capricious enforcement of policy, disparate treatment and intentional discrimination, and specifically as how this equal protection applies to the Airport, as New Hanover County was involved with litigation for the same types of actions in the past, in

*Jetstream Aero Services, Inc. v New Hanover County*, 672 F.Supp. 879 (E. D. N. C. 1987) and on

appeal at 884 F.2d 1388 (4ᵗʰ Cir.)(unpublished). Jetstream's equal protection claim arose from

the County's selective enforcement of county policies, airport regulations, or lease terms which

Jetstream claimed were intentionally done to harm Jetstream as the competing FBO against Bill

Cherry's FBO at ILM.

161.    Defendants have driven out, not one, but three FBOs in competition with Cherry and Air

Wilmington. First Jetstream, then I.S.O. Aero Service and WFC, and most recently, AviatMall.

All the while, Cherry's FBO continues to expand, with a hangar expansion scheduled for late

2015.

162.    Here, Defendants have acted arbitrarily, capriciously and maliciously by treating the

Plaintiffs unfairly, including, but not limited to: promulgating policies that harm the plaintiff and

benefit the competing FBO; evicting Plaintiff from the airport unjustly prior to the end of the 30-

day notice; conscripting WFC's property; refusing to treat WFC as a separate entity from I.S.O.

Aero Service and Ken Vojta; and refusing to negotiate with WFC on future leases. Since 2014,

the Airport Authority basically refuses to admit that WFC or ISO Aero Service exists, except to

make disparaging statements.

163.    The Defendants' discrimination of the Plaintiffs as compared to Cherry's FBO is not

rationally related to any legitimate government purpose and is without justification, cause, or

excuse. As recently as June of 2013, an aviation consultant presented findings to the Airport

Authority stating a two-FBO situation was effective for the airport to handle General Aviation at

ILM.

164.    The Defendants' actions towards Plaintiffs in the unequal enforcement of policies and the

enforcement of unjust policies were taken under the color of state law and in violation of the

Equal Protection Clause of the U.S. Const. Amend. XIV, for which the Defendants are liable to Plaintiffs under 42 U.S.C. 1983.

165.    As a direct and proximate cause of Defendants' disparate enforcement of policies and the promulgation and enforcement of policies designed to injure the Plaintiffs and benefit Cherry's FBO, Plaintiffs have suffered the loss of property, business, and other financial damages, the exact amount to be determined at trial.

166.    Plaintiffs are entitled to compensatory damages for the discrimination and retaliation that they have suffered from all Defendants, and declaratory and injunctive relief, including the imposition by injunction for equal and fair treatment of FBOs at ILM and equal and just treatment of plaintiffs and all other users of the airport facilities that fall under the jurisdiction of the Airport Authority.

## PRAYER FOR RELIEF

WHEREFORE, having fully set forth his claims in this Complaint against the defendants in the paragraphs above, Plaintiffs respectfully pray the Court as follows:

1.  A trial by jury on all issues so triable;

2.  The issuance of an injunction ordering the Airport Authority to designate procedures for ensuring policies, practice, custom and usage do not unjustly discriminate between FBOs, and training on those procedures for all ILM employees and agents;

3.  The issuance of an injunction requiring a new RFP process, allowing WFC and other interested parties to submit proposals for a secondary FBO;

4.  Damages in an amount to be determined at trial, to be charged jointly and severally upon the Defendants;

5.  Punitive damages to deter Defendants from engaging in future discriminatory conduct;

6. The costs of this action to be taxed to the Defendants;

7. An award of reasonable attorney's fees pursuant to 42 U.S.C. §1988; and

8. For such other and further relief as the court may deem just and proper.

This the 26th day of April, 2016.

/s/ Randolph M. James
Randolph M. James
RANDOLPH M. JAMES, P.C.
PO Box 20060
Winston-Salem, NC 27120
Telephone:  (336) 724-7707
Facsimile: (336) 724-9722
E-mail: rmjames@rmjameslaw.com
N.C. State Bar No. 10,000
Attorney for Plaintiffs