IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
NO. 7:16-CV-86-BO

| | |
|---|---|
| WFC MANAGEMENT CORP., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | **O R D E R** |
| ) | |
| NEW HANOVER COUNTY AIRPORT ) | |
| AUTHORITY, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

This matter comes before the Court upon defendants' motion to dismiss, made pursuant to Rule 12 of the Federal Rules of Civil Procedure [DE 16], and plaintiffs' motion to strike [DE 23]. Both motions are ripe for adjudication. For the reasons stated below, defendants' motion to dismiss is granted and plaintiffs' motion to strike is denied.

BACKGROUND

Defendants collectively are a municipal agency with responsibility for operating Wilmington International Airport ("ILM"), a mid-size county airport in Wilmington, North Carolina, and individuals employed by that agency. Plaintiffs are former managers of a fixed-base operator ("FBO") which provides fueling, airplane repair, and customs services for commercial and individually-owned airplanes. ISO Aero Service, Inc. ("ISO") operated as an FBO at ILM from 1990 to 2013, at which time plaintiffs purchased the assets of ISO and began operating as a general manager of that FBO until 2014. ISO remained at ILM solely as a leaseholder. Throughout the duration of this period another FBO, Air Wilmington, also operated at the airport.

Plaintiffs contend that defendants discriminated against them in their promulgation and application of policies because they favored the other FBO, Air Wilmington, and wanted to push plaintiffs out of the airport. Plaintiffs brought this § 1983 action alleging disparate treatment in violation of the Equal Protection Clause of the Fourteenth Amendment.

To support this claim, plaintiffs alleged injuries resulting from conduct which occurred over a period of 25 years, of which the essential allegations are summarized as follows.[1] Plaintiffs first claim that two policies, a fuel trucking policy and a customs ramp policy, disparately impacted them and were enacted to put them at an economic disadvantage in competing with the airport's other FBO. Plaintiffs also allege discriminatory treatment occurred when defendants terminated their signed lease in 2005 and converted it to a month-to-month lease when plaintiffs were behind on their payments. Plaintiffs say this broke an agreement to allow plaintiffs more time to pay rent. In two other instances defendants routed planes to Air Wilmington instead of plaintiff, which plaintiffs argue was discriminatory because they already had agreements to service those planes. Additionally, defendants required plaintiffs to remain staffed and did not offer a reduction in rent during periods of restricted airport access due to runway construction. Plaintiffs filed a discriminatory treatment complaint with the FAA in 2011, and the FAA found no violation by defendants.

After plaintiff WFC Management Corp. ("WFC"), owned by plaintiffs Gerard and Ann Tremblay, took over management of the FBO in 2013, defendants encouraged plaintiffs to submit a proposal of their plan to develop and utilize the property. Plaintiffs apparently submitted a non-compliant proposal because defendants offered a five year lease on the south

---

[1] For purposes of summarizing plaintiffs' complaint, the Court refers to ISO as a plaintiff although not a listed party because plaintiffs did so in their complaint and because plaintiffs claim standing in this matter to assert claims arising out of alleged injuries to ISO. The issue of standing is addressed fully below in the Court's discussion section.

side of the airport but plaintiffs requested a thirty year lease on the north side. Defendants gave plaintiffs an opportunity to correct their proposal, and rejected the proposal when it was not fixed. Plaintiffs claim this was discriminatory in that defendants negotiated in bad faith.

Finally, defendants cancelled plaintiffs' lease in 2014 citing security violations which plaintiffs believe were fabricated. After ejection, defendants confiscated property without storing it as promised and demolished a building without compensation. Throughout the complaint plaintiffs also cited negative remarks defendants made or allowed to be made about plaintiffs.

On April 26, 2016, plaintiffs filed their complaint, contending that defendants violated the Equal Protection Clause of the Fourteenth Amendment for disparate treatment and seeking damages, injunctive relief, and punitive damages. [DE 1]. On June 26, 2016, defendants filed the instant motion to dismiss. [DE 16].

## DISCUSSION

The Court first considers plaintiffs' motion to strike documents attached to defendants' motion to dismiss. In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents attached to the complaint, as well as those attached to the motion to dismiss so long as they are integral to the complaint and authentic. Fed. R. Civ. P. 10(c); *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007); *Philips v. Pitt County Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). The Court finds that the documents attached to defendants' motion to dismiss are integral to and referenced directly by plaintiffs' complaint, and that their authenticity has not been challenged by either party. For these reasons, plaintiffs' motion to strike is denied.

The Court next considers defendants' motion to dismiss, made under Rule 12(b)(6) of the Federal Rules of Civil Procedure. A Rule 12(b)(6) motion tests the legal sufficiency of the

complaint. *Papasan v. Allain*, 478 U.S. 265, 283 (1986). When acting on a motion to dismiss under Rule 12(b)(6), "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir.1993). A complaint must allege enough facts to state a claim for relief that is facially plausible. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Facial plausibility means that the facts pled "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and mere recitals of the elements of a cause of action supported by conclusory statements do not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint must be dismissed if the factual allegations do not nudge the plaintiff's claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

Defendants argue first in their motion to dismiss that plaintiffs do not have standing to assert most of the wrongs alleged in their complaint. Federal courts may consider only cases or controversies, and "the doctrine of standing has always been an essential component" of the case or controversy requirement. *Marshall v. Meadows*, 105 F.3d 904, 906 (4th Cir. 1997) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). To demonstrate standing, plaintiffs must establish that they have suffered an injury in fact that is concrete and particularized, that the injury is fairly traceable to the challenged action of the defendant, and that the injury is likely to be redressed by a favorable decision from the Court. *Chambers Med. Techs. of S.C., Inc. v. Bryant*, 52 F.3d 1252, 1265 (4th Cir. 1995). "The standing doctrine [] depends not upon the merits, but on whether the plaintiff is the proper party to bring the suit." *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 460–61 (4th Cir. 2005) (citations and quotations omitted). Constitutional standing—as with all issues implicating subject matter jurisdiction—may be determined by the Court at any time. *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010) (internal citations omitted).

4
Case 7:16-cv-00086-BO   Document 29   Filed 01/13/17   Page 4 of 15

"The party invoking the jurisdiction of a federal tribunal bears the burden of establishing standing." *Marshall*, 105 F.3d at 906.

Once a case falls into the constitutional boundaries of standing, a plaintiff could still lack standing under prudential principles of standing, which is a judicially-created limit on jurisdiction and encompasses limits "such as the general prohibition on a litigant's raising another person's legal rights . . . ." *CGM, LLC v. BellSouth Telecommunications, Inc.*, 664 F.3d 46 (4th Cir. 2011). The Supreme Court has recognized the right of litigants to bring actions on behalf of third parties only when (1) the litigant has suffered an "injury in fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute, (2) when the litigant has a close relation to the third party, and (3) when there exists some hindrance to the third party's ability to protect his or her own interests. *Powers v. Ohio*, 499 U.S. 400, 410–11 (1991).

Finally, a court must consider whether the parties bringing the suit meet the demands of the statute giving rise to the cause of action, in this case § 1983. A challenge to such statutory standing is properly understood under the standards of a Rule 12(b)(6) motion, distinctly separate from Article III and prudential standing, as a "dismissal for statutory standing is effectively the same as dismissal for failure to state a claim." *CGM*, 664 F.3d at 52.

Defendants argue that the majority of plaintiffs' allegations concern conduct related to the landlord-tenant relationship between defendants and ISO. Neither ISO nor its owner, Ken Vojta ("Vojta"), are parties to this lawsuit. As such, defendants argue that plaintiffs, as third parties to the conduct that occurred before their purchase of ISO in 2013, do not have standing—whether constitutional or prudential—to bring a claim based on such conduct. In support of this argument, defendants point out that plaintiff WFC acquired only the assets of ISO, and that ISO

continued in operation as a separate entity. Compl. ¶ 83, 85. Additionally, plaintiff WFC did not assume ISO's lease, and therefore did not assume any of the rights or obligations thereunder. Compl. ¶ 83.

Plaintiffs argue that WFC is "doing business as" ISO, and that WFC, along with plaintiffs Gerard and Ann Tremblay who are the owners and operators of WFC, "stepped into the shoes of" ISO when plaintiffs bought the assets of ISO, leaving Vojta as the leaseholder only. Compl. ¶ 83. Plaintiffs apparently argue that they possess "representational standing", and that they have an interest in this suit deriving from an assignment of rights. In support, plaintiffs cite *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, for the proposition that the Supreme Court has regularly entertained suits of representational standing. 529 U.S. 765, 773–74 ("Although we have never expressly recognized "representational standing" on the part of assignees, we have routinely entertained their suits.") (internal citations omitted). However, whether plaintiffs are asserting standing under the doctrine of "representational standing" or under the theory that the rights to this claim have been assigned to them, both assertions of standing require them to demonstrate that there has been an actual assignment of the claim at issue in the suit to them. Here, plaintiffs have provided no showing that they are the assignees of any claim belonging to ISO or Vojta. Plaintiffs simply assert that, as purchasers of ISO's assets and as a management company engaged in the business of running ISO's operations, they have assumed the claims of the company whose assets they purchased. This is not sufficient for showing that they possess assigned or representational standing to bring suit based on conduct occurring to ISO.

Plaintiffs argue, in the alternative, that they and ISO are so "inextricably bound" as to give rise to standing in plaintiffs as third parties to assert the claims of ISO and Vojta. Plaintiffs argue that they bought the assets of ISO, ran the day-to-day operations of ISO, and any economic

injury to ISO is an economic injury to them. Plaintiffs additionally assert that because individual plaintiffs Mr. and Mrs. Tremblay invested personal funds in ISO, that the alleged wrongs to ISO thereafter because personal to the Tremblays. However, the requirements of third party standing require more than just a close confluence of day-to-day interaction or business; as the Supreme Court has made clear, third parties can only assert the rights of others in the narrow circumstance when the third party itself has a sufficiently concrete interest in the outcome of the issue in dispute, when the litigant has a close relation to the third party, and when there exists some hindrance to the third party's ability to protect his or her own interests. *Powers*, 499 U.S. at 410–11. The close relation factor is more narrow than a simple business relationship, such as that of a doctor and patient recognized as sufficient for third party standing in *Singleton v. Wulff*, 428 U.S. 106 (1976). Even reading the complaint in the light most favorable to plaintiffs, the Court still cannot conclude that this was anything more than a business relationship completed at arms-length, and the Court cannot find any authority that separate entities engaging in business together are so inextricably bound as to allow one entity to assert the rights of the other in court, let alone pursue claims for alleged injuries that occurred before the business relationship first began. Additionally, the Court sees no particular reason why there is a hindrance to ISO itself bringing suit for the alleged wrongs which occurred before 2013.

As a result of the above discussion, the Court finds that plaintiffs' allegations do not demonstrate that they had a constitutionally protected interest in ISO's business or leasehold prior to purchasing ISO's assets in 2013. Plaintiffs additionally have not demonstrated that after 2013 they, either by assignment or by right under third party standing doctrine, have standing to assert claims based on alleged injuries to ISO or Vojta. Merely purchasing the assets of another does not make one an "assignee" for standing purposes. Nor are the two companies "inextricably

bound" when they are separate businesses engaged in an arms-length transaction without the sort of special relationship required to give rise to third party standing. For these reasons, plaintiffs do not have standing to assert claims based on alleged injuries to ISO or Vojta, and may pursue claims based on injuries personal to themselves.

Defendants argue next in their motion to dismiss that, even if plaintiffs do possess standing to assert the entirety of the allegations made in the complaint, most of this conduct is time-barred by a three year statute of limitations. "It is well-settled that sections 1983 and 1985 borrow the state's general personal injury limitations period." *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 187 (4th Cir. 1999). In North Carolina the statute of limitations for personal injury cases is three years. N.C. Gen. Stat. Ann. § 1-52; *Beck v. City of Durham*, 573 S.E.2d 183, 188 (2002). Plaintiffs' complaint, which was filed on April 26, 2016, alleges conduct dating back to 1990 and even earlier.

Plaintiffs do not dispute that the applicable statute of limitations in this case is three years, but dispute that any allegations occurring three years before the filing of the suit should be time-barred, arguing that the continuing wrong doctrine should act to toll the statute of limitations. In North Carolina, courts will toll the statute of limitations in § 1983 cases when a plaintiff is suffering from a continuing violation of their underlying constitutional right giving rise to the action. *See Amward Homes, Inc. v. Town of Cary*, 698 S.E.2d 404, 417 (2010), *rev. allowed by* 365 N.C. 210 (2011), *and aff. by equally divided court in* 365 N.C. 305 (2011). In general, "[t]o establish a continuing violation . . . the plaintiff must establish that the unconstitutional or illegal act was a . . . fixed and continuing practice." *Nat'l Advert. Co. v. City of Raleigh*, 947 F.2d 1158, 1166–67 (4th Cir. 1991) (citing *Perez v. Laredo Junior College*, 706 F.2d 731, 733 (5th Cir.1983)).

The Court does not need to assess whether in this particular instance the allegations constitute a sufficiently fixed and continuing practice such that the doctrine of continuing wrong can be invoked to toll the statute of limitations. The continuing wrong doctrine, if it would apply in this case, would toll the applicable statute of limitations only until early 2012 at the latest because it was at that time that plaintiffs, assuming for the sake of this analysis that they would have had standing for those injuries, knew or had reason to know of the alleged injury which is the basis for this action. As the Fourth Circuit has noted, the particular policies of the statute of limitations in question apply even to claims tolled by the continuing wrong doctrine, and therefore "a 'continuing wrong' theory should not provide a means of relieving plaintiff from its duty of reasonable diligence in pursuing its claims." *Nat'l Advert. Co.*, 947 F.2d at 1168 (citing *Ocean Acres Ltd. P'ship v. Dare Cty. Bd. of Health*, 707 F.2d 103, 107 (4th Cir. 1983)). As such, the continuing wrong doctrine does not toll the statute of limitations indefinitely, and the limitations period begins to accrue on a plaintiff's constitutional claim when the plaintiff knows of or has reason to know of the alleged injury which is the basis of its action. *Id.* In 2011, outside consultants retained by plaintiffs concluded that defendants' actions either directly or indirectly caused unjust and unfair treatment, Compl. ¶¶ 76, 77. ISO also filed an informal complaint of discrimination with the FAA in August and September of 2011. Compl. ¶¶ 78, 79. In February, 2012, the FAA responded with the opinion that there was no violation. Comp. ¶ 80. As a result of these events, plaintiffs knew or had reason to know of the possibility of litigating these claims in federal court by February, 2012, at the latest, and the limitations period for these claims would have expired by February, 2015. Therefore, because plaintiffs did not file their complaint until April of 2016, the Court finds that even if plaintiffs could assert claims for alleged injuries to ISO, any such allegations based on conduct occurring before April, 2013 would be time-barred.

9
Case 7:16-cv-00086-BO   Document 29   Filed 01/13/17   Page 9 of 15

The Court now turns to address the legal sufficiency of plaintiffs' substantive claims which defendants have challenged. Plaintiffs have brought this suit under § 1983 alleging violations of their rights under the Equal Protection Clause of the Fourteenth Amendment. Section 1983 provides a statutory basis to receive a remedy for the deprivation of a right "secured by the Constitution and laws" of the United States by a person acting under color of state law. *Zombro v. Baltimore City Police Dept.*, 868 F.2d 1364, 1366 (4th Cir. 1989) (quoting *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600 (1979). Under § 1983, a state actor may be held liable if that actor "subjects, or causes to be subjected" an individual "to the deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. Section 1983, however, does not create any new right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002).

The Equal Protection Clause of the Fourteenth Amendment prohibits states from denying any person equal protection of the laws. U.S. Const. amend. XIV, § 1. This constitutional provision "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). The equal protection requirement "does not take from the States all power of classification," *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (citing *Personnel Adm'r v. Feeney*, 442 U.S. 256, 271 (1979)), but "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Id.* (citing *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). This is because "[t]he Fourteenth Amendment's promise that no person shall be denied the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer v. Evans*, 517 U.S.

620, 631 (1996). Therefore, "[t]o succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Williams v. Hansen*, 326 F.3d 569, 576 (4th Cir. 2003) (internal quotation and citation omitted). If a plaintiff has made this showing, a court considers whether the "disparity in treatment can be justified under the requisite level of scrutiny." *Id.* In this case, because plaintiffs do not allege membership in a suspect class nor violation of a fundamental right, defendants' conduct receives only rational basis scrutiny under which classification in a statute is presumed valid if it is rationally related to a legitimate governmental interest. *Veney*, 293 F.3d at 731.

In considering only those allegations that plaintiffs have standing to assert and which are not time-barred, the complaint alleges that plaintiff Mr. Tremblay was prohibited from flight training at ILM, that plaintiffs submitted a bid which was rejected by defendants, that plaintiffs suffered as a result of the alleged improper cancellation of ISO's lease, that they were given only 18 hours to remove their belongings from the FBO property, that Mrs. Tremblay was not allowed onto the airport after eviction, and that plaintiffs also alleged suffering from disparaging remarks from defendants. Plaintiffs also allege that several policies enacted before they purchased the assets of ISO in 2013, including the 2000 customs ramp policy and the fuel truck policy, disparately impacted their operation as an FBO at the airport.

Upon a thorough review of the extensive allegations within the complaint, the Court finds that plaintiffs have failed to state a claim under § 1983 upon which relief can be granted. The actions alleged to have occurred after April, 2013 do not show that defendants engaged in intentionally discriminatory treatment with the goal of ousting plaintiffs from ILM. Instead, the

facts show a strained business relationship, but not that the airport engaged in treatment rising to level of discrimination under the standards discussed above.

These allegations fail to demonstrate a violation of the Fourteenth Amendment for several reasons. First, many of plaintiffs' allegations fail to show disparate treatment or disparate impact, because these allegations concern non-disparate treatment under facially neutral policies that applied to every other FBO in operation at the airport. It is not enough that plaintiffs were impacted by regulations promulgated by defendants. Undoubtedly they were, as the parties agree. Plaintiffs must instead show that they were impacted by regulations that affected them disparately from others similarly situated, which plaintiffs have not done. As to the 2000 customs ramp policy, plaintiffs have alleged no facts to show that the requirement to drive customers to the FBO, which applied to both plaintiffs and Air Wilmington, had any disparate impact on ISO's business in particular, such as by reducing the number of ISO's customers or causing any customers to select Air Wilmington over ISO. Plaintiffs have also not alleged that any other FBO was required to remain staffed during periods of restricted access due to runway construction or was offered a reduction in rent during periods of restricted access due to runway construction. They have not alleged that any other FBO offered assistance with late-arriving customers when plaintiffs were not. Plaintiffs have offered no allegations that other FBOs were not evicted after cited security violations, were granted any period of storage for items left behind after eviction, were authorized to be compensated for a demolished building, were allowed more than 18 hours to remove property, or were allowed onto the property after the cancellation of their lease. Plaintiffs allege no disparate treatment in being denied flight training. Finally, as to the request for proposal process in 2014, plaintiffs have not shown that they were treated any differently than any other participant in the process. To the extent plaintiffs allege discriminatory treatment

during the proposal process due to their status as a competitor of Air Wilmington, this is negated by the fact that the airport accepted the proposal of another outside competitor and accepted that competitor for a lease at the airport.

Second, where plaintiffs alleged that an injurious policy that did in fact affect each FBO differently, the Court is unable to find unconstitutional discrimination in the enactment or application of those policies because the two companies were dissimilarly situated. To the extent the fuel truck policy disparately impacted plaintiffs, the reason for the disparate impact of higher fuel costs was because, unlike Air Wilmington, plaintiffs' fuel farm was located at a different physical location in the airport than their leasehold, requiring them to transport fuel between the two locations. This was a condition under plaintiffs' control, and demonstrates that the two entities were not alike in all relevant respects. The fuel truck policy applied to all FBOs, and plaintiffs cannot complain of discriminatory treatment due to the resultant higher fuel costs they thereafter bore which resulted from their own actions and which placed them in a dissimilar situation from the other FBO.

Finally, plaintiffs have not negated every possible rational base for defendants' conduct. Plaintiffs attempt to negate any rational basis for defendants' actions by alleging that they were motivated solely by a discriminatory animus and citing remarks made by defendants. Receiving disparaging remarks of the type alleged here does not by itself constitute discriminatory treatment in violation of the Fourteenth Amendment. Plaintiffs additionally have not alleged that any other FBO was free from any and all negative comments of the type received by plaintiffs. Furthermore, plaintiffs' own complaint itself negates a lack of rationality as to many of defendants' actions. For example, as to the 2013 towing incident, plaintiffs in their own complaint admit that ILM chose Air Wilmington for the towing job because it already had a

contract with the client. As to the rejection of plaintiffs' proposal and termination of plaintiffs' lease, plaintiffs' own complaint negates an inference of discriminatory motives for these actions because plaintiffs admit that they submitted a non-compliant proposal and were given an opportunity to correct the proposal before it was rejected in favor of an outside competitor's proposal. Plaintiffs allege discriminatory treatment because they were a competitor with the other FBO, Air Wilmington, but their complaint shows that the airport replaced plaintiffs with another FBO after plaintiffs were evicted. This simple fact belies the very motivation claimed by plaintiffs to explain defendants' allegedly discriminatory actions, and the fact that the airport gave plaintiffs several opportunities to remain at the airport additionally negates the inference that the airport authority was acting discriminatorily against plaintiffs in favor of Air Wilmington simply because they were a competitor of Air Wilmington.

The Court finds that plaintiffs do not have a claim under § 1983. Even should the Court consider conduct occurring prior to 2013 which affected ISO, the entirety of plaintiffs' allegations does not give rise to a claim of disparate treatment in violation of the Constitution. First, plaintiffs fail to show that ISO was selectively treated compared to other FBOs that were similarly situated. For example, and as discussed above, the two allegedly discriminatory policies promulgated by the airport applied to all FBOs, and any disparate impact, such as increased fuel transportation costs, was because ISO was located at a different spot in the airport than Air Wilmington and therefore not similarly situated. Additionally, the entirety of the complaint includes many facts which actually negate an inference of intentional discrimination and instead suggest that defendants gave plaintiffs and ISO many opportunities to remain at ILM. For example, defendants overturned the fuel truck policy after five years—an action that benefited only ISO. Defendants allowed ISO to stay on a month-to-month lease for nine years


14
Case 7:16-cv-00086-BO Document 29 Filed 01/13/17 Page 14 of 15

after it defaulted on its lease. Defendants encouraged plaintiffs to submit a request for proposal to stay at the airport and gave them an opportunity to correct its non-compliant proposal before ultimately rejecting it. Defendants and ISO had a nearly 25 year-long business relationship, with many years between instances of allegedly unfair treatment outlined in the complaint. Receiving disparaging remarks of the type alleged here—notably less than five remarks alleged over 25 years—also does not constitute discriminatory treatment in violation of the Fourteenth Amendment. A few disparaging remarks and isolated incidents are not enough to show a malicious bad faith or intent to injure, especially considering the facts that show defendants gave ISO many opportunities to remain at ILM, opportunities which ISO accepted over the course of twenty-five years.

Plaintiffs bear the burden of pleading in their complaint that it is more than a "sheer possibility" that defendants acted unlawfully. Plaintiffs have not met that burden here, and the complaint should be dismissed. Finding that the complaint does not give rise to a plausible inference of discrimination, the Court need not address defendants' additional arguments regarding qualified and municipal immunity.

## CONCLUSION

For the reasons stated above, defendants' motion to dismiss [DE 16] is GRANTED, and plaintiffs' motion to STRIKE [DE 23] is DENIED. The Clerk is DIRECTED to enter judgment accordingly and to close the file.

SO ORDERED, this 12 day of January, 2017.

Terrence W. Boyle
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE